BART F. VIRDEN, Judge
Wayne Edens, as executor of the estate of Lois Jean Edens ("appellant"), appeals from the White County Circuit Court's order denying a motion for recusal filed by appellant's attorney, James A. Simpson, Jr. Appellant argues on appeal (1) that there is a conflict in the disqualification law that needs clarification; (2) that the standard of review for disqualification decisions should be de novo, rather than abuse of discretion; and (3) that, even under the current standard of review, the trial court abused its discretion by refusing to recuse. We agree with appellant's third point; therefore, we reverse and remand.
I. The Ferguson Decision
We begin with a discussion of the Ferguson decision by the Arkansas Supreme Court because appellant argues that the trial court here did not apply the proper analysis set forth in Ferguson when deciding whether to recuse. In Ferguson v. State , 2016 Ark. 319, 498 S.W.3d 733, our supreme court granted a petition for review of our decision in Ferguson v. State , 2015 Ark. App. 722, 479 S.W.3d 25, and held that the trial court abused its discretion in not recusing from criminal proceedings when it had previously presided over an adjudication hearing. In the dependency-neglect proceedings, the trial court adjudicated Jacqueline Ferguson's child dependent-neglected and ruled from the bench, "There was physical abuse of the child younger than six years of age. I don't see how you can find anything else." The trial court was later assigned to preside over criminal proceedings after the State filed an information charging Ferguson with domestic battering of that same child. Ferguson filed a motion for recusal on the basis that the "exact same" allegations were being made in the criminal matter as had been made in the dependency-neglect proceedings and that the trial court had demonstrated bias with its comments from the bench. The trial court denied the motion for recusal and denied a jury-trial waiver. Ferguson's case was tried before a jury, and she was convicted of second-degree battery.
In Ferguson's petition for review of this court's decision affirming her conviction, she argued that the trial court abused its discretion in denying her motion to recuse based on Rule 2.11 of the Arkansas Code *181 of Judicial Conduct, which requires a judge to disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned, including circumstances where the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of facts that are in dispute in the proceeding and where the judge has presided over the matter in another court.
The supreme court held that the plain wording of Rule 2.11 required the judge to recuse because, by virtue of having presided over the matter in a different court, the judge's impartiality might reasonably be questioned. The supreme court noted that the enumerated examples in the rule are not the only way a judge's impartiality might reasonably be questioned. The supreme court stated,
In the case before us, Ferguson asserted that Judge [Barbara] Elmore's comments in ruling from the bench indicated that she was biased. In denying Ferguson's motion to waive a jury trial, Judge Elmore stated, "If you don't think that I can be impartial in a bench trial, then I'll deny your bench trial. So we'll have a jury trial." It is unnecessary to decide whether these comments indicated actual bias. The fact that Judge Elmore found that Ferguson's questioning of her impartiality required her to withdraw as the finder-of-fact, in essence, demonstrates that the questioning of her impartiality was reasonable. Obviously, if a judge's impartiality may "reasonably" be questioned, the mandatory portion of Rule 2.11 (A) is invoked and the judge is required to disqualify. Significantly, our case law requires a circuit court to be mindful of the perception of bias from the litigant's perspective.
Ferguson , 2016 Ark. 319, at 7, 498 S.W.3d at 737.
In the present case, appellant asserts that the Ferguson decision stands for the proposition that Rule 2.11's use of the word "shall" has mandatory-rather than discretionary-implications, that no showing of actual bias is necessary, and that an objective standard of a reasonable person is determinative of the issue of whether a trial court should recuse. According to appellant, the Ferguson decision did not explain the conflict in our disqualification case law and did not expressly overrule conflicting precedent, leaving room for misunderstanding and misapplication of the analysis, which appellant asserts is what happened here.
II. Motion for Recusal
Mr. Simpson filed a motion for recusal on behalf of appellant requesting that Circuit Judge Thomas Hughes recuse from "any cases involving undersigned Counsel or members of his firm or otherwise cause all cases filed by undersigned counsel or his firm in 1st division to be transferred to another division." The motion for recusal contains the following allegations minus the references to the many attached exhibits:
a. Undersigned counsel represented Sharon Jones in a case styled Lisa Petiriches, Sharon Duncan, Luay Dejani and Summer One, LLC v. Sharon Jones , case number CV-2011-535-3, which was originally in this Court and division. The case became known as the "lottery case." This Court ruled against Ms. Jones in a controversial decision and outcome but later recused from the proceedings and granted a new trial after motions filed by undersigned counsel. The case was extremely public and received national attention. Ms. Jones ultimately received a favorable outcome in the case once it was transferred to another Court.
*182 b. Undersigned counsel filed a complaint with the Judicial Discipline and Disability Commission for reasons which speak for themselves in the complaint. The major points of the JDDC complaint dealt with this Court's improper and inappropriate actions while presiding over the above referenced "lottery case."
c. The JDDC filed undersigned counsel's complaint against the Court for which the Court had to answer. In the process of that proceeding, the Court was confronted with the complaint made by undersigned counsel. That situation and the lottery case are consistently and continuously involved in this case as set out herein.
d. Sometime in late 2013 or early 2014, local attorney, Carla Fuller, entered the race against the Court for the Circuit Judge of the 17th Judicial District, 1st Division. Undersigned counsel was in no way involved with Ms. Fuller's decision to run for the position yet the Court blames undersigned counsel for Ms. Fuller running against him.
e. During the course of the campaign, the Court and his wife made unfavorable public comments and statements to other County officials, local attorneys and other court personnel making their dislike of undersigned counsel known at the Wilbur Mills Courts Building where the Court's office is located.
f. Undersigned counsel endorsed a letter to various residents of White and Prairie Counties and friends supporting Ms. Fuller in her campaign and requesting contributions to her campaign. In the days following the letter being mailed, the spouse of the Court confronted a friend of undersigned counsel, accused undersigned counsel of slandering the Court and stated that, "I am going to get him for this."
g. The letter sent out by undersigned counsel never mentions the Court nor makes any references of any kind that can be taken as slander or any negative remark against the Court yet a threat to "get him" was made by the spouse of the Court.
h. On the Court's campaign Facebook page, references were made to one discontented attorney who was spreading mistruths about the Court. The references appear to be directed at the undersigned counsel.
i. On May 16th, 2014, the Court was campaigning at a restaurant in Kensett, White County, Arkansas. In a conversation with a local gentleman who was dining at the restaurant, the Court called undersigned counsel an "arrogant prick," and blamed him for the difficulty of his campaign. Mr. [Nicky] Hamilton referenced the lottery case to the Court when undersigned counsel was mentioned by name and the Court used the derogatory reference.
j. On the day of the election, the Court made public comments mentioning undersigned counsel by name to local attorney, Winston Collier, and other individuals saying how much he was bothered by undersigned counsel. He discussed at length how hurt and bothered he was by undersigned counsel. He discussed the toll that he felt because of the lottery case, dealing with undersigned counsel and the campaign.
k. The Court made known to the Circuit Clerk [Tami King] through his words and actions that he was mad at, had bad feelings for and spoke of undersigned counsel in a negative light.
*183 l. The Court blamed undersigned counsel for actions during the campaign that are completely untrue. The Court has made known to multiple local attorneys of his dislike, ill will and hatred for undersigned counsel by name. Further, the Court has acknowledged his dislike of undersigned counsel but fears that his recusal from undersigned counsel's cases would allow undersigned counsel to "win" and/or start a domino effect of recusal motions from other lawyers if this motion is granted.
m. Undersigned counsel filed a motion for recusal that included all of the allegations above in the case of The Estate of Karmel Ferren, Deceased , case no. PR-2013-259-1. This Court denied that motion without giving undersigned counsel a hearing. That ruling was appealed to the Arkansas Court of Appeals in the case of Ferren v. USAA , Ark. Ct. App. Case no. CV 14-766. The Arkansas Court of Appeals reversed and remanded the decision of this Court in [an] opinion dated September 16, 2015 [2015 Ark. App. 477, 469 S.W.3d 805]. In its opinion, the Court of Appeals reversed and directed that this Court give undersigned counsel a hearing on the Motion for Recusal. The Court of Appeals did not issue an opinion as to the outright recusal although it stated that the motion filed by undersigned counsel, "clearly consisted of more than conclusory allegations of bias or prejudice." The day after the opinion came down, this Court granted the Motion for Recusal yet never gave undersigned counsel a hearing.
n. The Court of Appeals issued a Mandate directing the Court [to] pay undersigned counsel $1,581.85. Said amount remains unpaid creating further reasons for the Court to recuse due to the fact that undersigned counsel is a creditor of the Court.
o. Based upon the opinion rendered by the Arkansas Court of Appeals and this Court's decision to enter the Order of Recusal in the Estate of Karmel Ferren , undersigned counsel sent a letter to the Court asking for the Court to transfer all cases with undersigned counsel to another Division of the 17th Judicial District. The facts stated above are the same considered by the Court of Appeals and are the same facts upon which this Court recused in the Estate of Karmel Ferren case.
p. In response to the letter, this Court sent a letter to opposing counsel in each and every case that undersigned counsel represents a party in this Court's Division. In that letter, this Court accused undersigned counsel of having prohibited ex-parte communication with the Court. This is, once again, an act of this Court attacking undersigned counsel which reflects this Court's failure and inability to be impartial toward undersigned counsel and the clients that he represents. Ex-parte communication is described as follows: "An ex parte communication occurs when a party to a case, or someone involved with a party, talks or writes or otherwise communicates directly with the judge about the issues in the case without the other parties' knowledge." (Legal-dictionary.thefreedictionary.com.) As can be seen from reading the letter from undersigned counsel, undersigned counsel did not refer to any issue of another case nor mention any fact or detail of any particular case. This Court has insinuated and accused undersigned *184 counsel of having an ex-parte communication with the Court that is in no way an ex-parte communication. Despite the obvious fact, this Court has accused undersigned counsel of committing an unethical act and has attempted to disparage undersigned counsel to multiple attorneys. This Court clearly is impartial [sic] in any and all matters involving undersigned counsel.
q. Undersigned counsel filed a motion for recusal in the case of Phifer v. Ouellette, et al. , White Co. case no. CV-2013-156, which included all of the above facts. The motion was filed on July 7, 2016. On Thursday, July 21, 2016, undersigned counsel was notified via telephone just before 5:00 p.m. by the Court's case coordinator that a hearing was set for July 28, 2016, just seven (7) days later. It was the first time that a hearing had ever been granted by the Court to undersigned counsel on any recusal motion involving the facts above. A motion for continuance was filed so that all relevant witnesses could be procured for the hearing. That motion was denied.
r. A hearing in the Phifer case was held on July 28, 2016. All of the facts above were developed at the hearing. Tami King and undersigned counsel testified live. Deposition testimony was given. Exhibits were introduced. Despite the evidence introduced at the hearing, this Court denied the motion for recusal in an order entered on August 1, 2016.
s. The full hearing and presentation of the facts set forth above speak for themselves.
t. Despite the fact that an order denying the motion for recusal was already entered on August 1, 2016, this Court took it upon himself to enter an amended order. The amended order speaks for itself. Entry of another order was not legally necessary. The amended order is laced with evidence of this Court's bias against undersigned counsel.
Mr. Simpson attached fifteen exhibits to the motion and requested that a previous hearing held in a different case, Phifer v. Ouellette, Personal Representative of the Estate of Ruth Cowin, et al. , CV-13-156-1, serve as the factual basis on which the trial court would determine whether to recuse from appellant's case. The trial court granted Mr. Simpson's request to consider the Phifer hearing and agreed that another hearing was unnecessary.
A. The Phifer Hearing
At the Phifer hearing, Judge Hughes began by denying appellant's motion for continuance in order to subpoena necessary witnesses, such as Nicky Hamilton and Winston Collier, mentioned in the allegations above. Tami King testified that she is the circuit clerk of White County and that she has known Judge Hughes for over twenty years as an attorney and as a judge. She said that she and Judge Hughes have offices in the same building and speak from time to time. King stated that she was aware that the lottery case in 2012 created "a problem as far as [Mr. Simpson's] relationship with Judge Hughes." She recalled the election of 2014 and said that if Judge Hughes mentioned Mr. Simpson's name, "it wasn't in a positive light." She stated that Judge Hughes and his wife were mad at Mr. Simpson. King said that Judge Hughes complained to her about "young, spoiled attorneys" and that she thought Judge Hughes was referring to Mr. Simpson. During Mr. Simpson's examination of King, the trial *185 court interrupted several times and objected to the questioning.
Attorney Brett Watson attempted to call Mr. Simpson as a witness, but the trial court did not accept Mr. Watson's entry of appearance filed that same day on the basis that the trial court had not been notified.[1] The following colloquy occurred:
THE COURT : Well, sir, do you have any evidence that you informed me that you were going to be coming on as attorney in this case or would like to come on?
MR. WATSON : Your Honor, I filed my notice in the record. The Rule does not require instantaneous notice.
THE COURT : Sir-
MR. WATSON : There's nothing that requires instantaneous notice in that Rule. And two hours is really quick notice.
THE COURT : What does immediately mean to you, sir?
MR. WATSON : Well, it can mean a few hours. It might mean seven days since when you set this hearing it took seven days to set it. But-
THE COURT : Oh, you wanted it faster?
MR. WATSON : No, Your Honor. I actually think that the Motion-it should have been continued and that it was set extremely quickly in violation of the way the Court typically sets hearings.
THE COURT : Sir, did you not see the Petition filed by Mr. Simpson asking for an immediate hearing? And are you now criticizing me for giving Mr. Simpson a hearing within seven days when he asked for an immediate hearing?
The trial court then refused to permit Mr. Simpson to act as both an attorney in the case and as a witness but later stated, "I think it's unethical. But if you want Mr. Simpson to testify, have him testify." The following colloquy occurred:
MR. WATSON : And just in response to your statement that it is unethical-
THE COURT : Sir, I don't want your response.
MR. WATSON : Okay. For the record then-
THE COURT : I don't want your response. I'm ordering you not to respond.
MR. WATSON : You're ordering me not to make a record?
THE COURT : Oh, you can make a record, sir.
MR. WATSON : Okay.
THE COURT : But I'm going to tell you right now, I said Mr. Simpson can testify. I expressed my position as a Judge that reading [Arkansas Rule of Professional Conduct] 3.7 would indicate that a lawyer should not testify as a witness. You may disagree with that. Now, I'm allowing your client to testify. If you want to say something obnoxious or if you want to make any comment whatsoever, go there, make your comment. Enjoy yourself. Make your comment. Make your record.
MR. WATSON : For the record, the Judge's comments today at this hearing and his attitude he reflected towards Mr. Simpson and toward me as the plaintiff's attorney is significant-
THE COURT : Sir, you're not attorney of record in this case.
MR. WATSON : -is significant evidence-
THE COURT : Sir, you can stop-
MR. WATSON : -of why-
THE COURT : -right now.
MR. WATSON : -you should recuse.
*186 THE COURT : Sir, I did not rule that you were [an] attorney in this case. I'm ruling you're not attorney of record in this case. You did not give me notice timely. You may sit down.
MR. WATSON : So is that-are you changing your ruling from what you told me a few minutes ago to call Mr. Simpson up here and ask him questions, Your Honor?
THE COURT : No. Mr. Simpson, you can-Mr. Simpson can come up here and testify. But if your job, sir, is to come and just stand here and try to cause confusion rather than clarity, I'm not going to have that. You didn't file a motion until some time today. At that time you stated that you were going to be the attorney in the case. I ruled-I looked at you, I talked to you, I said I don't think you're entitled to be an attorney in this case. You did not qualify properly. You didn't give me immediate notice. Then I did waive it. I said, fine, go ahead. I'll stand with that. Go ahead. Fine, even though I don't think you're qualified, great, go ahead. I'm sorry. Go ahead. Even though I don't think Mr. Simpson's actions are in compliance with Rule 3.7, once again continue, put him up. If he feels comfortable and you feel comfortable, put him up. And if you want to make a record some more, go right ahead.
Mr. Simpson testified that he had a good relationship with Judge Hughes until the lottery case in 2012. He said that the issue of recusal came up when two local attorneys told him that Judge Hughes had made statements to them. The trial court objected to the testimony as hearsay. When asked why Judge Hughes eventually recused, the trial court objected because Mr. Simpson "would [not] have any idea of what my motivation was." Mr. Watson attempted to introduce a motion for recusal filed in the lottery case into evidence, but the trial court refused to admit it because it contained hearsay. The trial court allowed in only portions that did not contain hearsay. Mr. Watson argued that it was not being offered for the truth of the matter asserted, but the trial court disagreed and refused to admit the portions deemed to be hearsay. Mr. Watson proffered the motion. Mr. Simpson described the next exhibit as an amended order granting a new trial and motion to recuse. Mr. Simpson then read the following from the order:
Part of the order says, given the irregularities in the proceeding, the Court orders a new trial. In view of repeated attacks by James A. Simpson, Jr. against the integrity of this Court, this Court's impartiality might reasonably be questioned in the new trial of this case, and the Court will recuse from presiding over the new trial pursuant to Rule 2.11 of the Arkansas Rules of Judicial Conduct. It is so ordered. Signed by Judge Thomas Hughes on May 25, 2012.
Mr. Watson then asked Mr. Simpson what his experience was with the judge to whom the case was transferred, and the trial court asked how it was relevant if there was not some comparison. The trial court began disagreeing with Mr. Watson about whether Mr. Simpson had testified to the treatment he had received from Judge Hughes. Mr. Watson moved to introduce a complaint Mr. Simpson had filed with the Judicial Discipline and Disability Commission (JDDC) against Judge Hughes, but the trial court denied the motion, stating that the complaint was privileged and "totally irrelevant" because the Commission found no wrongdoing. The trial court stated, "And they didn't the second time either, sir, and if you intend to try to get the second Complaint filed, *187 that's not coming in either for the same reason." Mr. Watson attempted to explain the complaint's relevance, but the trial court said,
I don't want to hear about the snide suggestions that I have somehow violated the Rules of Ethics. Mr. Simpson had his day with the Commission. He filed his complaints twice. I had to answer twice. And if you're just trying to establish that I didn't enjoy the process, I'll acknowledge that I did not enjoy reading those Affidavits or Complaints Mr. Simpson filed. I did not think that what was said should have led to any finding of ethical violation, and I certainly found myself spending a lot of time having to respond. And I really didn't enjoy spending that time when I've got a lot of work to do on a lot of cases.
Mr. Watson and the trial court argued about Mr. Watson's attempt to make a record; Mr. Watson was permitted to explain why the complaint should be admitted and proffered the exhibit. Mr. Simpson began to testify about why he had filed the first complaint with the JDDC, and the trial court struck his testimony because Mr. Simpson lacked personal knowledge of what had been said about the lottery case; Mr. Simpson was not competent to testify; and Mr. Simpson's testimony amounted to hearsay. Mr. Simpson and the trial court then began arguing about whether there had been a hearing on a motion for recusal filed in the lottery case. The following colloquy occurred:
THE COURT : And I can tell you right now you never filed that Motion for Recusal until after you lost the case.
[ MR. SIMPSON ]: Well, Judge, the record will speak for itself. That's just not true.
THE COURT : Yes, it will. The record will speak for itself. And the record is in the courthouse. I'm familiar with the record. And, Mr. Simpson, you didn't file a Motion to Recuse until after you lost. And when you did, I recused.
[ MR. SIMPSON ]: Well, if I may, my memory is quite certain that we had a meeting. It was Winston Collier and myself and Red Morgan and his co-counsel on the case, Paul Petty, John Bell met in Judge Hughes's chambers regarding-
THE COURT : I strike that. I strike that. That's Mr. Simpson's hearsay testimony. The Rule in the Arkansas Rules of Civil Procedure is it's the obligation of the attorney to make a record. If he fails to make a record, it's his fault, no one else's fault. If you've got a record, Mr. Simpson, of that meeting, show it to us.
[ MR. SIMPSON ]: I'll do that, Judge. I can either supplement that with an Affidavit or-
THE COURT : I don't want an Affidavit. I want you to tell me if you had a hearing on the issue of recusal. I told you you could. Did you have a hearing on the issue of recusal? And if so, where is the record of it?
[ MR. SIMPSON ]: And to go on-
MR. WATSON : Hold on, Mr. Simpson. Judge, I understand your ruling about Mr. Simpson testifying about this meeting. You're saying even though he was there, you're saying it's hearsay because there's not an official court record of it?
THE COURT : No, sir. I'm saying that if Mr. Simpson was present, he can certainly say what he heard. I have no objection to that. I'm just saying if he has something regarding knowledge that he's basing on hearsay, I'm not going to allow that to come in.
Later in the hearing, the trial court ruled that it would admit both complaints *188 to the JDDC into evidence under seal, along with earlier documents that Mr. Watson sought to admit. Mr. Simpson testified that a local businessman, Nicky Hamilton, told him that Judge Hughes said that "there are a couple of attorneys up town who think they should get special favors because of who they are or what law firm they are in," to which the trial court said, "Counsel, if you're going to read that Affidavit, don't read it in such a fashion that it would imply what it does not imply." The trial court instructed Mr. Watson to read the affidavit but then said, "That's fine. I'm not going to question it. I've seen it often enough, sir, I'm familiar with it. I think I've got it memorized at this point." When Mr. Watson sought to enter a letter written by Mr. Simpson on behalf of Carla Fuller and her campaign, the trial court stopped the questioning to ask the relevance of the letter. When Mr. Watson responded that it showed evidence of bias, the trial court agreed to admit it but then asked to see the letter and said, "I sure don't find it offensive." Mr. Watson then asked the trial court if a break was needed, and the trial court answered affirmatively.
When the trial court returned from the break, Mr. Watson asked for clarification on admission of earlier exhibits. The trial court stated,
[T]his is such an extraordinary hearing where I'm being asked to hear the case, make rulings on evidence, and at the same time I'm not removed from the case like I normally am. Normally, I have nothing in the case. Somebody wins, somebody loses. There's no reason for anybody to question my impartiality. But when the subject is whether I am impartial when it comes to cases of Mr. Simpson's, I'm afraid even if I make a ruling that I think is correct under the law, and I think these all have been, nonetheless people might not understand that I'm doing it from the perspective of Judge and not as an individual.
The trial court then said that because his objections could be misinterpreted, "I don't care what you put in.... By that I mean, enter it, exhibit it, if you feel comfortable with it, you just do what you want." The trial court explained,
I'm going to avoid playing Judge on the admission of evidence. As I reflect on it, I think it doesn't give the right impression. The only person supposedly it would harm if it comes in would be me, which definitely gives the impression I might not want it to come in because it could be damaging to me. I'm afraid people won't think I'm doing it just because I'm looking at it as Judge. So I'm just not going to stop anybody from putting anything in.
The trial court remained quiet during the rest of Mr. Simpson's testimony. Mr. Simpson testified that there were other cases in which the trial court had exhibited "unusual or prejudicial behavior" toward him or his client. Mr. Simpson then described two probate cases and the trial court's review of an administrative agency's finding. Mr. Simpson asserted that in those cases the trial court had suggested that Mr. Simpson had not handled matters properly and ruled against his client even though the opposition had offered no evidence to the contrary. At the end of the Phifer hearing, the trial court permitted Mr. Simpson to make a statement, and then Judge Hughes said, "I'd like to say quite sincerely I would be most happy to recuse from all of Mr. Simpson's cases. But I really think I can be fair and impartial."
After the Phifer hearing, the trial court entered a one-sentence order denying the motion for recusal. A few weeks later, the trial court entered a nine-page amended *189 order, denying the motion. Appellant referred to this amended order in his motion for recusal, describing the order as being "laced with evidence of this Court's bias." The amended order contained the following statements after the trial court's ruling:
I cannot and will not be concerned about the egos of the attorneys who appear before me.
I do not care about Mr. Simpson's wounded vanity. His refusal to accept responsibility for the professional errors he committed in the Petriches case has tainted his view toward me as a person and as a judge. Judges can make mistakes; that is what the appellate system is about. Instead of appealing the Petriches decision, Mr. Simpson elected to start his campaign to systematically destroy my good name and to engage in a continuing pattern of harassment toward me.
Everyone sitting in the courtroom has the dubious pleasure of listening to Mr. Simpson recite once again his delusional thoughts and assumptions about me and my supposed behavior or thoughts concerning him and the Petriches case. He even brought my wife, who is an attorney with over thirty-eight (38) years in practice, with a good reputation and known among the local bar association to be in poor health, into this case over a conversation which purportedly happened in 2014 at our church.
Mr. Simpson clearly has no appreciation for nor understanding of the importance of officers of the court showing respect towards the court. He has demonstrated clear contempt of the Arkansas Supreme Court by his repeated violation of Rule 7 regarding mandatory confidentiality of proceedings before the Arkansas Judicial Discipline and Disability Commission. I am aware of another judge who has been harassed by an attorney who regularly appeared before him. Judges have become like fish in a barrel-easy targets to be defamed with impunity.
If an attorney or a litigant does not want a particular judge and can successfully forum shop by making a judge uncomfortable, spreading gossip or lies about the judge, or by an attorney telling his client the judge does not like him or the litigant and thereby achieve the judge's recusal, the entire judicial system is threatened.
Any appearance of bias that might be perceived has come strictly through Mr. Simpson's continued repeating of his delusional tales and imagined slights. I do not care what Mr. Simpson says about me personally. When Mr. Simpson, however, accuses me of acting unethically in my judicial capacity, it interferes with the performance of my duties and casts a pall over the judiciary.
III. Order on Appeal Denying Motion for Recusal
The trial court entered an order denying appellant's motion. In it, the trial court stated that it had made every effort to convey to Mr. Simpson that he should have no concerns about appearing before it. Attached to the order was a transcript from a meeting held in chambers on April 18, 2013, among Judge Hughes, Mr. Simpson, and attorney James "Red" Morgan. The trial court noted that this probate matter was a random assignment and that Mr. Simpson had waived a hearing on his motion for recusal. The trial court wrote, "Lest any person believe Mr. Simpson thought any decision on this motion to be urgent, it took 182 days for Mr. Simpson to file the motion and bring the motion to the court's attention." The trial court stated that it had carefully reviewed the supreme court's decision in *190 Ferguson, supra , along with Justice Paul Danielson's dissent. The trial court noted that the supreme court "found that the judge's statements made at the dependency-neglect adjudication hearing might cause the defendant to reasonably question the circuit judge's impartiality toward the defendant" and therefore required recusal. (Emphasis in original.) The trial court then noted that the dissent pointed out that the supreme court has previously held that recusal is not required of a judge presiding over a postconviction proceeding merely because he or she presided over the defendant's trial; that the court has previously stated that when a judge's communications are the basis for an allegation of bias, it is necessary to view the communications that the judge makes to, or in front of, the jury; and that the mere fact of adverse rulings is not enough to demonstrate bias. The trial court found that
the decision in Ferguson , supra , has not substantially changed the law of this state regarding recusal. To find otherwise, would impose an intolerable burden on the judiciary and judicial process in this state. Any individual displeased with a judge's decision in a prior hearing in a case could theoretically ask for the judge to recuse in subsequent hearings involving the same issues, such as a change of custody of a minor child, and claim the judge's comments and/or findings at or during a previous hearing were an indication of possible bias.
Referring to the Phifer hearing, the trial court stated that the hearing had lasted over two hours and that Mr. Simpson had been "afforded every opportunity to present his case for recusal." The trial court further stated that Mr. Simpson's actions were not sufficient "to cause such antipathy towards him that I cannot perform the duties of my office impartially and without bias" and noted that Mr. Simpson had made no allegation that either he or his clients had been treated unfairly by the trial court. The trial court thus denied appellant's motion. The trial court then made the following statements:
I acknowledge it was distasteful to sit and listen to the litany of meritless complaints made by Mr. Simpson in the public recusal hearing. In these situations the judge under attack has no attorney to represent him or her. He has no one to point out the discrepancies in the testimony or, in this case, the baseless nature of the attack on the presiding judge. There is no one in the courtroom to make objections or otherwise assist the judge in enforcing compliance with the rules of evidence and civil procedure. Mr. Simpson even violated Rule 7 regarding mandatory confidentiality of proceedings before the Arkansas Judicial Discipline and Disability Commission during the recusal hearing by publicly discussing confidential matters of the Arkansas Judicial Discipline and Disability Commission. I allowed and listened to all of this evidence at the public record hearing in deference to Mr. Simpson's hearing request.
....
Any appearance of bias that might be perceived by any individual has come strictly through Mr. Simpson's continued repeating of his unjustified accusations and imagined slights.
....
I believe Mr. Simpson's repeated attempts to have me recuse from his cases are a determined form of "forum shopping." Appellant now appeals from this order.
IV. Discussion
A. Denial of Motion for Recusal
Canon 2 of the Arkansas Code of Judicial Conduct provides that a "judge *191 shall perform the duties of judicial office impartially, competently, and diligently." Rule 2.11(A)(1) of the Code provides that a judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned, including when the judge has a personal bias or prejudice concerning a party or a party's lawyer. A judge is presumed to be impartial, and the party seeking recusal must demonstrate bias or prejudice on the part of the judge. Ferren v. USAA Ins. Co. , 2015 Ark. App. 477, 469 S.W.3d 805. The proper administration of the law requires not only that judges refrain from actual bias but also that they avoid all appearance of unfairness. Id. When a judge exhibits bias or the appearance of bias, the appellate court will reverse. Id. We review a trial court's denial of a motion to recuse under an abuse-of-discretion standard. Ferguson, supra. A clearly erroneous interpretation or application of a law or rule will constitute a manifest abuse of discretion. Id. To decide whether there has been an abuse of discretion, the appellate courts will review the record to determine if prejudice or bias was exhibited. Owens v. State , 354 Ark. 644, 128 S.W.3d 445 (2003).
Here, appellant argues that his request for recusal was based on the bias the trial court exhibited toward Mr. Simpson, and even more broadly, it was the appearance of bias that reasonably brought the trial court's impartiality into question. Appellant argues that in the order denying his motion, the trial court seemingly admitted feeling antipathy toward Mr. Simpson but indicated that it was not such that he could not perform his judicial duties impartially and without bias. Appellant asks, "How can a judge have a deep-seated feeling of dislike against an attorney, yet assure that attorney that he will receive impartial treatment?" Appellant also argues that the trial court acknowledged that there may be a perceived appearance of bias but that the appearance of bias was the result of Mr. Simpson's "repeating of his unjustified accusations and imagined slights." Appellant states that the culmination of events leading up to his motion for recusal is proof that the slights against Mr. Simpson are anything but imaginary.
An objective review of this record reveals that appellant's attorney has had what could be described as a contentious relationship with Judge Hughes that has continued over the course of several years. We note that Mr. Simpson has filed two complaints with the JDDC against the trial court and that the trial court has recused from Mr. Simpson's cases in the past, citing Mr. Simpson's "repeated attacks" against it. Considering what transpired at the Phifer hearing and the personal statements leveled at Mr. Simpson after the trial court issued its rulings in Mr. Simpson's cases, we think the trial court's impartiality has reasonably been questioned. While each allegation from appellant's motion for recusal viewed in isolation may not have been sufficient, we hold that those allegations are sufficient when viewed as a whole to create what could be perceived as bias against Mr. Simpson, and by extension, Mr. Simpson's client. Because the trial court's impartiality was reasonably brought into question, Rule 2.11 required the trial court to recuse according to Ferguson . We hold that the trial court abused its discretion in denying appellant's motion for recusal.
B. Remaining Points
Appellant argues that, even though the discretionary standard for recusal has been abandoned, courts have continued to apply then existing case law when deciding disqualification issues. Appellant also asserts that disqualification decisions have been reviewed under the highly deferential *192 abuse-of-discretion standard for decades but that the standard is incongruent with the current disqualification analysis and should be abandoned in favor of the more appropriate de novo standard.
While these arguments are interesting and may even have merit, because we have ruled in appellant's favor on his third point and are granting the relief that he seeks, we need not address his remaining points. We conclude that, even under the more deferential standard of review, appellant prevails. We also point out that, to the extent that appellant requests that this court overrule cases applying what he argues is an "incorrect analysis," we cannot overrule decisions by the Arkansas Supreme Court. Moe v. State , 2017 Ark. App. 546, 532 S.W.3d 110.
Reversed and remanded.
Gladwin and Vaught, JJ., agree.

Ark. R. Civ. P. 64(a).